# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* RHEA BRODY LIVING TRUST, dated
January 17, 1978, as amended.

ROBERT BRODY,

      Intervenor-Appellant/Cross-
      Appellee,

v

CATHY B. DEUTCHMAN,

      Petitioner-Appellee/Cross-Appellee,

and

MICHAEL BARTON, Special Fiduciary,

      Intervenor,

and

JAY BRODY,

      Intervenor-Appellee/Cross-
      Appellant.

FOR PUBLICATION
September 12, 2017
9:25 a.m.

No. 330871
Oakland Probate Court
LC No. 2015-361379-TV

Before: O'BRIEN, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

      In this case involving the Rhea Brody Living Trust, Rhea's husband, Robert Brody, appeals as of right the probate court's order granting partial summary disposition to Rhea and Robert's daughter, Cathy B. Deutchman. In relevant part, the order resolved claims relating to two family businesses, Brody Realty and Macomb Corporation, declared Rhea Brody disabled

-1-

pursuant to the terms of the trust, and removed Robert as successor trustee of the trust. Jay Brody, Rhea and Robert's son and the brother of Cathy, cross-appeals.[1] We affirm in part, reverse in part, and remand for further proceedings.

## I. PROBATE COURT JURISDICTION

On appeal, Robert and Jay ask this Court to vacate the probate court's orders for lack of subject matter jurisdiction. According to Robert and Jay, the trust action included a "business or commercial dispute" as defined in MCL 600.8031(1)(c) and was therefore within the mandatory jurisdiction of the business court under MCL 600.8035. We disagree.

Neither Robert nor Jay raised the jurisdictional issue in the lower court. However, "[s]ubject-matter jurisdiction cannot be waived and can be raised at any time by any party or the court." *In re Contempt of Dorsey*, 306 Mich App 571, 581; 858 NW2d 84 (2014), vacated in part on unrelated grounds 500 Mich 920 (2016). " 'Whether the trial court had subject-matter jurisdiction is a question of law that this Court reviews de novo.' " *Bank v Michigan Education Ass'n-NEA*, 315 Mich App 496, 499; 892 NW2d 1 (2016), quoting *Rudolph Steiner Sch of Ann Arbor v Ann Arbor Charter Twp*, 237 Mich App 721, 730; 605 NW2d 18 (1999). "We review de novo questions of statutory interpretation, with the fundamental goal of giving effect to the intent of the Legislature." *Bank*, 315 Mich App at 499.

"Subject-matter jurisdiction is conferred on the court by the authority that created the court." *Reed v Yackell*, 473 Mich 520, 547; 703 NW2d 1 (2005). The probate court is a court of limited jurisdiction and derives its power from statutes. *Manning v Amerman*, 229 Mich App 608, 611; 582 NW2d 539 (1998). Specifically, MCL 700.1302 grants the probate court "exclusive legal and equitable jurisdiction," over matters concerning "the validity, internal affairs, or settlement of a trust; the administration, distribution, modification, reformation, or termination of a trust; or the declaration of rights that involve a trust, trustee, or trust beneficiary." Additionally, MCL 700.1303(h) provides for concurrent legal and equitable jurisdiction over claims by or against a fiduciary or trustee.

---

[1] Cathy argues that because Jay had no pecuniary interest in Robert's removal as trustee, he is not an aggrieved party pursuant to MCR 7.203(A), and therefore, he lacks standing to file a claim of cross-appeal. We disagree. The order removing Robert as trustee is a final order. "To be aggrieved, one must have some interest of a pecuniary nature in the outcome of the case, and not a mere possibility arising from some unknown and future contingency." *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291; 715 NW2d 846 (2006) (quotation marks and citation omitted). The probate court's prior orders included remedies for breaches by Robert, including reformation of the terms of a sale of the Brittany Park property to Jay and canceling an option agreement to which Jay was a party. "Where a party has claimed an appeal from a final order, the party is free to raise on appeal issues related to other orders in the case." *Bonner v Chicago Title Ins Co*, 194 Mich App 462, 472; 487 NW2d 807 (1992). Because the probate court's remedies for Robert's breaches affected Jay, Jay has standing to file a cross-appeal challenging the probate court's rulings related to Robert's conduct, which served as the basis for the court's decision to remove Robert as trustee.

A business court's jurisdiction is established by MCL 600.8035, which provides that "[a]n action shall be assigned to a business court if all or part of the action includes a business or commercial dispute." MCL 600.8035(3). Under MCL 600.8031(1)(c), a "business or commercial dispute" means, among other things, "[a]n action involving the sale, merger, purchase, combination, dissolution, liquidation, organizational structure, governance, or finances of a business enterprise." Notwithstanding the broad definition of "business or commercial dispute" found in MCL 600.8031(1)(c), the Legislature specifically excluded proceedings under the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, in MCL 600.8031(3)(e).

Robert and Jay first argue that this action fell within the mandatory jurisdiction of the business court because it involved "the rights or obligations of . . . members . . . or managers" of a company, MCL 600.8031(2)(b), an action "arising out of contractual agreements or other business dealings," MCL 600.8031(2)(c), and an action "involving the sale, . . . purchase, . . . or finances of a business enterprise," MCL 600.8031(1)(c)(*iv*). Accordingly, they contend, Cathy was required to bring the action in the circuit court for business court assignment. This argument lacks merit. Matters brought under the EPIC are specifically excluded from the definition of "business or commercial dispute" in MCL 600.8031(1)(c). Cathy sought Robert's removal as trustee of Rhea's estate, and reversal of damage she alleged that Robert had already caused to the interests of the trust. Cathy's petition seeking Robert's removal as trustee, delivery of all accountings of trust property to an appointed trustee, temporary court supervision of the trust, an order rescinding transactions Robert entered as trustee, and damages for the Rhea Trust, was brought under various provisions of the EPIC. To the extent the petition involved transactions of the Brody family businesses or existing contracts, these matters arose only tangentially to the central issue of Robert's breach of fiduciary duty as trustee of the Rhea Trust. Cathy's petition clearly fell within the range of matters specifically excluded from the definition of "business or commercial dispute" under the business court statute.

Next, Robert and Jay argue that, regardless of the nature of Cathy's petition, her claims fell within the mandatory jurisdiction of the business court under MCL 600.8035(3), which states that "[a]n action that involves a business or commercial dispute that is filed in a court with a business docket shall be maintained in a business court although it also involves claims that are not business or commercial disputes, *including excluded claims under section 8031(3)*." (Emphasis added.) Robert and Jay ask this Court to interpret the above language as requiring every case affecting or affected by a business matter, including a trust case, to be brought before the business court. We decline to do so.

When this Court interprets a statute, our goal is to give effect to the Legislature's intent as determined by the statutory language. *Bukowski v City of Detroit*, 478 Mich 268, 273; 732 NW2d 75 (2007). "In order to accomplish this goal, this Court interprets every word, phrase, and clause in a statute to avoid rendering any portion of the statute nugatory or surplusage." *Id.* at 273-274. Here, we find Robert's and Jay's proposed construction of the second sentence of MCL 600.8035(3) inconsistent with the plain language of the statute. Specifically, we note that the Legislature employed the phrases "an action . . . *filed in* a court with a business docket," and "shall be *maintained* in a business court," (emphasis added), in its jurisdictional mandate. These phrases indicate a Legislative intent to hold cases originally filed in the business court for the extent of proceedings, regardless of whether the business dispute also involves, or comes to

involve, excluded subject matter. This simple reading of the statutory language is consistent with the Legislature's stated purpose in establishing the business court, which is to "[a]llow business or commercial disputes to be resolved with expertise, technology, and efficiency," MCL 600.8033(3)(b), and "[e]nhance the accuracy, consistency, and predictability of decisions in business and commercial cases," MCL 600.8033(3)(c). To read this section as requiring every action affecting a business to be originally filed in the business court or transferred to the business court upon the inclusion of matters affecting a business would be to read language into the statute that simply does not exist, and to brush aside the Legislative goal of accuracy and efficiency by imposing on the business courts mandatory jurisdiction over a seemingly endless variety of nonbusiness-related matters.[2]

Further, Robert's and Jay's proposed construction of the business court statute would create a direct conflict between the mandatory jurisdiction of the business court over all matters affecting or involving a business with the exclusive jurisdiction of the probate court to consider probate and trust matters. "If two statutes lend themselves to a construction that avoids conflict, that construction should control." *Parise v Detroit Entertainment, LLC*, 295 Mich App 25, 27; 811 NW2d 98 (2011) (quotation marks and citation omitted). The construction of MCL 600.8035(3) proposed by Robert and Jay would render the probate court without jurisdiction to consider any trust matter that also involved or affected, however tangentially, a business transaction. We cannot reconcile this construction with the Legislature's grant of exclusive jurisdiction to the probate court over trust matters. Nor can we reconcile the proposed construction of MCL 600.8035(3) with the Legislature's stated purpose for its broad grant of exclusive jurisdiction on the probate court, which is "to simplify the disposition of an action or proceeding involving a decedent's, a protected individual's, a ward's, or a trust estate by consolidating the probate and other related actions or proceedings in the probate court." MCL 700.1303(3).

Finally, to the extent the probate court's grant of exclusive jurisdiction over trust matters in MCL 700.1302 and MCL 700.1303 conflicts with the broad inclusion of trust-related matters within the exclusive jurisdiction of the business court under MCL 600.8035(3), we conclude that the more specific grant of jurisdiction in MCL 700.1302 and MCL 700.1303 controls. Both statutes confer jurisdiction on a court, and "[w]hen two statutes are *in pari materia* but conflict with one another on a particular issue, the more specific statute must control over the more general statute." *Donkers v Kovach*, 277 Mich App 366, 371; 745 NW2d 154 (2007).

---

[2] Notably, by amendment effective October 11, 2017, the Legislature has amended MCL 600.8031 to remove any "action involving the sale, . . .purchase, . . . or finances of a business enterprise" from its broad definition of "business or commercial dispute." 2017 PA 101. Once the statute takes effect, a "business or commercial dispute" will include only actions in which at least one party is a business enterprise. MCL 600.8031(1)(c) (as amended). We find the Legislature's recent amendment persuasive evidence of a Legislative intent to limit the business court's jurisdiction to matters substantially involving the affairs of a business.

"While it is true that a judgment entered by a court that lacks subject-matter jurisdiction is void, subject-matter jurisdiction is established by the pleadings and exists when the proceeding is of a class the court is authorized to adjudicate and the claim stated in the complaint is not clearly frivolous." *Clohset v No Name Corp*, 302 Mich App 550, 561; 840 NW2d 375 (2013) (quotation marks and citations omitted). Cathy's petition was brought under the EPIC, and the probate court had exclusive jurisdiction over Cathy's claims under MCL 700.1302 and MCL 700.1303. Robert's and Jay's jurisdictional challenge therefore fails.

## II. STANDING

Robert and Jay both argue that Cathy did not have standing (i.e., she was not a proper party) to request adjudication of the issues in her petition, including Robert's removal as trustee of the Rhea Trust and reversal of actions taken by Robert as trustee. We disagree.

The parties dispute whether, at the time Cathy filed her petition, the trust was revocable or irrevocable. Robert and Jay argue that Cathy has no beneficial interest in the trust because she is a contingent beneficiary, and the trust is revocable. Robert's and Jay's argument is premised on three assumptions: (1) that Rhea has not been declared disabled pursuant to the trust, and her trust is revocable by its plain terms, or (2) that the trust's terms render it revocable by Robert, the trustee and holder of a DPOA, indefinitely, and (3) that a contingent beneficiary does not have standing to bring an action regarding the administration of a revocable trust. We need not consider the validity of Robert's and Jay's first two assumptions, however, because we conclude that their argument fails on its third assumption.

Whether a party has standing is a question of law that this Court reviews de novo. *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 527; 695 NW2d 508 (2004). "[S]tanding refers to the right of a party plaintiff initially to invoke the power of the court to adjudicate a claimed injury in fact." *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 290; 715 NW2d 846 (2006). In *Pontiac Police & Fire Retiree Prefunded Group Health & Ins Trust Bd of Trustees v City of Pontiac No 2*, 309 Mich App 611, 621-622; 873 NW2d 783 (2015), this Court explained the relationship between standing and a real party in interest:

> MCR 2.201(B) provides that "[a]n action must be prosecuted in the name of the real party in interest . . . ." The real party in interest is a party who is vested with a right of action in a given claim, although the beneficial interest may be with another. In general, standing requires a party to have a sufficient interest in the outcome of litigation to ensure vigorous advocacy and "in an individual or representative capacity some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy." Both the doctrine of standing and the included real-party-in-interest rule are prudential limitations on a litigant's ability to raise the legal rights of another. Further, "a litigant has standing whenever there is a legal cause of action." But plaintiffs must assert their own legal rights and cannot rest their claims to relief on the rights or interests of third parties. The real party in interest is one who is vested with the right of action as to a particular claim, or, stated otherwise, is the party

who under the substantive law in question owns the claim asserted. [Citations omitted.]

The probate court found that Cathy had standing pursuant to MCL 700.7201, which provides, in pertinent part, that "[a] court of this state may intervene in the administration of a trust to the extent its jurisdiction is invoked by an *interested person* or as provided by law." MCL 700.7201(1) (emphasis added). Under MCL 700.7201(3):

A proceeding involving a trust may relate to any matter involving the trust's administration, including a request for instructions and a determination regarding the validity, internal affairs, or settlement of a trust; *the administration*, distribution, modification, reformation, or termination of a trust; or the declaration of rights that involve a trust, trustee, or trust beneficiary, including, but not limited to, proceedings to do any of the following:

(a) *Appoint or remove a trustee*.

(b) Review the fees of a trustee.

(c) Require, hear, and settle interim or final accounts.

(d) Ascertain beneficiaries.

(e) Determine a question that arises in the administration or distribution of a trust, including a question of construction of a trust.

(f) Instruct a trustee and determine relative to a trustee the existence or nonexistence of an immunity, power, privilege, duty, or right.

(g) Release registration of a trust.

(h) Determine an action or proceeding that involves settlement of an irrevocable trust. [Emphasis added.]

The definition of "interested person" is provided in MCL 700.1105(c), which states:

"Interested person" or "person interested in an estate" includes, but is not limited to, the incumbent fiduciary; an heir, devisee, child, spouse, creditor, and beneficiary and any other person that has a property right in or claim against a trust estate or the estate of a decedent, ward, or protected individual; a person that has priority for appointment as personal representative; and a fiduciary representing an interested person. Identification of interested persons may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, a proceeding, and by the supreme court rules.

The probate court properly determined that Cathy is an interested person under MCL 700.1105(c). There is no dispute that Cathy is Rhea's child. In addition, Cathy is a "beneficiary." Under MCL 700.1103(d), a beneficiary includes a "trust beneficiary," defined as

a person with "a present or future beneficial interest in a trust, vested or contingent." Black's Law Dictionary defines "beneficial interest" as "[a] right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing. For example, a person with a beneficial interest in a trust receives income from the trust but does not hold legal title to the trust property." The plain language of the trust indicates that Cathy has a future (upon Rhea's death), contingent (assuming no revocation or amendment) interest in the trust property. See Restatement Trusts, 1d, § 56 comment f (intervivos trust where death of settlor is a condition precedent results in a "contingent equitable interest in remainder"). Specifically, Cathy will receive Rhea's clothing and jewelry. In addition, if Robert predeceases Rhea, then a subtrust comprising 50% of the Rhea Trust's remaining assets is created for Cathy. If Rhea predeceases Robert, then a marital trust and a family trust are created, and under the marital trust, Rhea's descendants are each entitled to net income distributions and any principal necessary for education, health, support, and maintenance.

Robert and Jay ask this Court to adopt the approach of other jurisdictions in holding that a contingent beneficiary lacks standing to challenge the administration of a revocable trust. Robert's and Jay's reliance on the Uniform Trust Code (UTC) and cases from other jurisdictions is misplaced. Cases from other jurisdictions are inapposite because they involve statutory language that does not control here. Although we may look to decisions from other jurisdictions for guidance, *In re Lampart*, 306 Mich App 226, 235 n 6; 865 NW2d 192 (2014), we need not look outside our jurisdiction when our own law is clear. Because Cathy is an interested person under MCL 700.1105 and could invoke the court's jurisdiction to remove a trustee under MCL 700.7201(3)(a), she had standing to file her petition. Given our conclusion, we find it unnecessary to address the parties' dispute over whether Rhea was "disabled" under the trust terms during the relevant time periods, or whether the trust is revocable or irrevocable.

## III. BREACH OF FIDUCIARY DUTIES BY ROBERT

In his cross-appeal, Jay argues that the probate court erred when it found no genuine issue of material fact regarding Robert's breach of fiduciary duty to the trust and granted partial summary disposition in favor of Cathy. Robert makes a similar claim in his reply brief on appeal.[3] We disagree.

Because the probate court necessarily relied on facts outside the pleadings, we treat the court's grant of summary disposition as though it was supported by MCR 2.116(C)(10). See *Sharp v City of Lansing*, 238 Mich App 515, 518; 606 NW2d 424 (1999). A motion is properly granted under this subrule if no genuine issue of material facts exists and the moving party is entitled to judgment as a matter of law. *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 713; 706 NW2d 426 (2005). In reviewing a lower court's decision, this Court must view all the submitted admissible evidence in a light most favorable to the nonmoving party. *In re Smith Estate*, 252 Mich App 120, 123; 651 NW2d 153 (2002). "A genuine issue of

---

[3] Robert did not raise this argument in his statement of questions presented in his opening brief on appeal. Therefore, the claim would be waived, except that it is properly raised by Jay. See *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011).

material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

This Court generally reviews the probate court's decision to remove a trustee for an abuse of discretion. *In re Duane v Baldwin Trust*, 274 Mich App 387, 396-397; 733 NW2d 419 (2007). An abuse of discretion occurs only when the probate court's decision falls outside the range of principled outcomes considering the facts and circumstances of the case. *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007). This Court reviews the language in a will or trust de novo, and the objective of a court in construing a trust is to "give effect to the intent of the settlor." *In re Stillwell Trust*, 299 Mich App 289, 294; 829 NW2d 353 (2012) (quotation marks and citation omitted).

According to the terms of the Rhea Trust, Robert, as trustee, was required to act in the best interests of the trust beneficiaries. Robert was also a trust beneficiary, and under the plain language of the trust, Robert was prohibited from possessing powers that would permit him to enlarge or shift the beneficial interests under the trust. According to the trust's terms, if Robert came to possess such power, he was required to appoint an independent co-trustee. The Rhea Trust held a 98% interest in Brody Realty, one of the companies owned and operated by the Brody family. As manager of Brody Realty, Robert possessed the power to sell interests belonging to or affecting the trust, and he acted pursuant to that power. First, Robert sold Brody Realty's membership interest in the Brittany Park property to Jay and Jay's two children, Stuart Brody and Rachel Brody. Second, Robert sold Jay an option to purchase the Rhea Trust's interest in both Brody Realty and the Macomb Corporation. In arguing that Robert did not breach his fiduciary duty by entering into these transactions, Robert and Jay point to provisions in the Rhea Trust and a durable power of attorney (DPOA) executed by Rhea appointing Robert as her attorney-in-fact, which grant Robert broad authority over the trust property. But Rhea limited those powers with the trust provision requiring appointment of a co-trustee. Robert failed to appoint a co-trustee to ensure that the beneficiaries' best interests were served while he served in a potentially conflicting role, and there is no dispute that his failure constituted a breach of his duties under the trust.

Jay argues that the Brittany Park property was not an asset of the Rhea Trust, and any provisions limiting a shift in beneficial interests under the trust did not apply to the Brittany Park sale. Jay also claims that an option agreement between Robert and Jay, which gave Jay an option to purchase the Rhea Trust's interests in Brody Realty and Macomb Corporation, did not enlarge or shift any interests because even if he exercised his option under the agreement, Jay and Cathy would still each receive 50 percent of the Rhea Trust's assets. These arguments fail. Brittany Park was owned by Brody Realty. The Rhea Trust owned 98 percent of Brody Realty, and was therefore interested in the sale. Under the option agreement, Jay's acceptance would shift Cathy's interest from 50% of Brody Realty to 50% of any proceeds from its sale. There is no guarantee that these separate interests would be equivalent, especially given the potential of income from Brody Realty. Under the Rhea Trust, Jay and Cathy would have each shared 50 percent of the remaining trust property following the deaths of their parents, including Brody

Realty. The probate court did not clearly err in concluding that the option contract shifted interests under the trust to favor Jay.

Robert and Jay further argue that there was no breach of fiduciary duty with respect to the option agreement because Robert was not required to treat his children equally and the Rhea Trust allowed him to make unequal distributions or to delay distributions. They are correct that, under Articles 8 and 9 of the trust, if Rhea predeceases Robert, the trust provisions will benefit Robert and he will have the power to appoint and distribute assets in "equal or unequal proportions." But Rhea has not predeceased Robert, and the probate court did not clearly err in determining that the Rhea Trust was created with the general intent to treat Cathy and Jay equally. Trust Article 10 provides that upon the death of the survivor of Rhea and Robert, the trust property not previously distributed will be divided in separate trusts, with 50 percent to Jay and 50 percent to Cathy. Both Robert and Cathy testified that Rhea intended an equal distribution between the two siblings. It is uncertain who will live longer—Rhea or Robert—or what article of the Rhea Trust will control. While any inequities in the option agreement may be permissible under Articles 8 and 9, any inequity created by the Brittany Park sale or the option agreement would be inconsistent with the 50/50 split under Article 10. The probate court did not err in concluding that there was no genuine issue of material fact regarding Robert's breach of fiduciary duty.

## IV. APPROPRIATE REMEDIES

Robert and Jay also take issue with the remedies imposed by the probate court with respect to both the Brittany Park sale and the option agreement, arguing that the probate court lacked the power to reform or rescind a contract. We agree, in part, as to the Brittany Park sale.

"This Court reviews equitable decisions of the probate court de novo, but overturns any underlying factual findings only upon a finding of clear error." *In re Filibeck Estate*, 305 Mich App 550, 553; 853 NW2d 448 (2014). "A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made." *Loutts v Loutts*, 298 Mich App 21, 26; 826 NW2d 152 (2012) (quotation marks and citations omitted). "The granting of equitable relief is ordinarily a matter of grace, and whether a court of equity will exercise its jurisdiction, and the propriety of affording equitable relief, rests in the sound discretion of the court, to be exercised according to the circumstances and exigencies of each particular case." *Tkachik v Mandeville*, 487 Mich 38, 45; 790 NW2d 260 (2010) (quotation marks and citation omitted).

## A. REFORMATION OF THE BRITTANY PARK AGREEMENT

Pursuant to a 2013 purchase agreement, Brody Realty sold its 63.5-percent interest in Brittany Park to Jay Brody's Trust, Jay's daughter Rachel, and Jay's son Stuart. One purchase agreement documented the sale of the interest in two separate transactions, occurring on December 17, 2013 (13.6 percent) and December 31, 2013 (49.9 percent). Due to a purported lack of marketability and control, as well as extensive capital improvements required, Robert reduced the first sale price with a 15-percent discount and the second sale price with a 40-percent discount. The total amount of the sale price was $3,348,857.18, which included a down payment of $1,050,000. Pursuant to the agreement, Jay's trust was required to repay the entire amount of

the outstanding debt at an interest rate of 1.65 percent over 9½ years. Robert personally loaned Jay $850,000 to help him make the repayments. Ultimately, Jay Brody's Trust attained a 62-percent interest in the Brittany Park Apartments, while Rachel and Stuart each received a 10-percent interest.

The probate court determined that Jay was complicit in Robert's breaches of fiduciary duty and identified a "whole pattern of favoring Jay Brody at the expense of Cathy . . . ." After the probate court removed Robert, it reformed the Brittany Park purchase agreement to increase the purchase price to $4,293,406.64, and to increase the interest rate on the balance to 3.99 percent.

Reformation was not appropriate in this case. Reformation is an equitable remedy available for contracts if the writing "fails to express the intentions of the parties . . . as the result of accident, inadvertence, mistake, fraud, or inequitable conduct . . . ." *Najor v Wayne Int'l Life Ins Co*, 23 Mich App 260, 272; 178 NW2d 504 (1970); see also *Holda v Glick*, 312 Mich 394, 403-404; 20 NW2d 248 (1945). Courts of equity have the power to reform contracts so that they may "conform to the agreement actually made." *Casey v Auto-Owners Ins Co*, 273 Mich App 388, 398; 729 NW2d 277 (2006) (quotation marks and citation omitted). If the basis for a proposed reformation is mistake, the mistake must be mutual. *Holda*, 312 Mich at 403-404. A mistake in law, i.e., a mistake by one side or the other regarding the legal effect of an agreement, is not a basis for reformation. *Casey*, 273 Mich App at 398.

The probate court erred when it reformed the purchase agreement for the Brittany Park sale because the parties to the Brittany Park sale intended the purchase price and interest rate to be the amounts delineated in the plain language of the purchase agreement. There is no evidence that they intended anything different.

Cathy argues that, regardless of the rules of contract, the probate court was permitted to reform the purchase agreement for the Brittany Park sale pursuant to its broad power under MCL 700.7901 to remedy a breach of trust. Specifically, Cathy argues that the probate court could "trace trust property wrongfully disposed of and recover the property or its proceeds" under MCL 700.7901(2)(i). We disagree. MCL 700.7901 provides:

> (1) A violation by a trustee of a duty the trustee owes to a trust beneficiary is a breach of trust.

> (2) To remedy a breach of trust that has occurred or may occur, the court may do any of the following:

> (a) Compel the trustee to perform the trustee's duties.

> (b) Enjoin the trustee from committing a breach of trust.

> (c) Compel the trustee to redress a breach of trust by paying money, restoring property, or other means.

> (d) Order a trustee to account.

-10-

(e) Appoint a special fiduciary to take possession of the trust property and administer the trust.

(f) Suspend the trustee.

(g) Remove the trustee as provided in section 7706.

(h) Reduce or deny compensation to the trustee.

(i) Subject to section 7912, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds.

(j) Order any other appropriate relief.

The language of MCL 700.7901 makes no express reference to reformation. Rather, through MCL 700.7901, the Legislature only empowered the probate court with authority to void a sale, impose a lien or constructive trust on property, or recover property and its proceeds.

Cathy also argues that reformation was permissible under the probate court's authority to "[o]rder any other appropriate relief" under MCL 700.7901(2)(j). This Court has defined "appropriate" as " 'particularly suitable; fitting; compatible,' " or " '[s]uitable for a particular person, condition, occasion, or place; proper; fitting.' " *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 262; 617 NW2d 777 (2000), quoting *Random House Webster's College Dictionary* (2d ed, 1997), and *The American Heritage Dictionary: Second College Edition* (1985). In this case, the reformation was not fitting because, as discussed earlier, the Brittany Park sale did not fail to express the intent of the parties. An order to recover proceeds from a sale could have been tailored to remedy the specific breach of fiduciary duty—here, Robert's and Jay's complicity in managing the trust contrary to Rhea's intent and without appointing a co-trustee to protect the beneficiaries best interests—by ordering the responsible parties to pay for any inequity. Moreover, the probate court's chosen remedy was not particular to the circumstances because the reformation affected the interests of Jay's trust, Stuart, and Rachel. There is no evidence in the record that Stuart and Rachel played a role in any improper conduct. Reformation was not appropriate under the plain language of MCL 700.7901(2)(j).

Cathy argues that the probate court's contract reformation was appropriate as an incident to its broad equitable powers. Cathy cites *Evans v Grossi*, 324 Mich 297, 305; 37 NW2d 111 (1949), for the proposition that a court of equity "may do whatever is necessary, not only for the preservation of trust property but, also, whatever is necessary for the protection of the rights of beneficiaries and the promotion of their interests." But a court's equity powers are not unlimited. Our Supreme Court has explained that "[a]lthough courts undoubtedly possess equitable power . . . [a] court's equitable power is not an unrestricted license for the court to engage in wholesale policymaking." *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 590-591; 702 NW2d 539 (2005). "Equity jurisprudence mold[s] its decrees to do justice amid all the vicissitudes and intricacies of life." *Tkachik*, 487 Mich at 45-46 (second alteration in original;

quotation marks and citation omitted). The probate court's order did not weigh the intricacies of the sale against the parties responsible for the misconduct, and it erred when it chose the remedy of reformation of the Brittany Park purchase agreement.[4]

In his brief on cross-appeal, Jay claims that he should now have the option to rescind the Brittany Park agreement because of mistake or material change to the subject of the contract. But a party who bears the risk of a mistake is not entitled to rescind the contract. *Lenawee Co Bd of Health v Messerly*, 417 Mich 17, 30; 331 NW2d 203 (1982). In this case, the probate court found that Jay was complicit in Robert's breaches of his fiduciary duties. Therefore, it would not be unreasonable to allocate the risk of mistake to Jay. However, the probate court did not consider this issue and we will not decide it on appeal. The probate court should consider whether rescinding the contract for mutual mistake is appropriate on remand.

Jay also argues that the probate court could have treated the Brittany Park sale as a gift or advance on future distributions. Indeed, under the terms of the Rhea Trust, the trustee was permitted to make gifts to Rhea's descendants for the best interests of Rhea, her family, and the estate. Any gift was required to be "deemed a satisfaction of such legacy or distribution, pro tanto, and that the gift or transfer made by the Trustee is not considered to be in addition to such legacy or distribution." Although MCL 700.7901(2)(j) authorizes the court to "[o]rder any other appropriate relief," it is for the probate court on remand, not this Court on review, to determine whether treating the sale as a gift is particularly suited to the circumstances.

Finally, Jay argues that the probate court incorrectly eliminated the discounts for lack of marketability and control in the Brittany Park sale when it increased the purchase price. Because we have concluded that the probate court's reformation of the Brittany Park purchase agreement was in error, we find it unnecessary to address the propriety of the marketability discounts at this time.[5] Any remaining factual questions must be resolved on remand.

## B.  SETTING ASIDE THE OPTION AGREEMENT

---

[4] In light of this outcome, we decline to address Jay's argument that no claim regarding the Brittany Park sale was properly before the probate court because Robert was acting as a manager of Brody Realty when he executed the sale, not as a trustee of the Rhea Trust.

[5] Robert and Jay also argue that the probate court violated Stuart's and Rachel's right to due process by reforming the purchase agreement for the Brittany Park sale without giving Stuart and Rachel notice and an opportunity to be heard regarding the matter. In light of our decision, it is unnecessary to address this constitutional issue. Moreover, Stuart and Rachel have not complained of any violation, and Robert and Jay do not have standing to assert Stuart's and Rachel's due process claims on their behalf. *Barrows v Jackson*, 346 US 249, 255; 73 S Ct 1031, 1034; 97 L Ed 1586 (1953).

Robert and Jay also argue that the probate court improperly set aside an option agreement entered between Robert and Jay granting Jay the option to purchase substantial amounts of the Rhea Trust interest upon Rhea's death. We disagree.

In exchange for approximately $103,322 and $33,325.24, Robert sold Jay an option to purchase "everything," including the Rhea Trust's interest in Brody Realty and the Macomb Corporation, as well as the interest in Brody Realty and the Macomb Corporation held by Robert's trust. The period to exercise the option would begin on the nine-month anniversary of Rhea's death and end on the 15-year anniversary of her death. Due to the option's existence, the Rhea Trust's assets would remain frozen until the option was exercised or the 15-year option period had expired. The purchase price would be determined by the "fair market value of the membership interests or capital stock . . . considering all applicable valuation discounts." If Jay exercised the option related to the Rhea Trust interest in Brody Realty, Jay would repay the purchase price to the Rhea Trust in monthly payments over nine years at the midterm applicable federal rate of interest. Pursuant to the option agreement, Jay also received an irrevocable present proxy to vote Robert's interest in Brody Realty, which prevented Robert from exercising his rights to vote and directly conflicted with his responsibilities under the Rhea Trust:

> From the date of Rhea's death until all the options provided under this agreement have expired, Rhea's trust shall use all means at its disposal to ensure that Jay (and not Cathy Deutchman or Jim Deutchman) manages Brody Realty . . . and Macomb Management includes [sic] voting control of Brody Realty and Macomb, amending articles, by-laws, operating agreements and entering into all contracts including agreements to sell and property management agreements. To ensure the foregoing, Rhea's Trust will provide Jay with irrevocable proxies to represent Rhea's Trust at any meeting of the members or managers of Brody Realty and any meeting of the Macomb Shareholders.

The option agreement further provided:

> In the event Cathy Deutchman or James Deutchman, directly or indirectly, interfere with or attempt to interfere with Jay Brody's rights under this agreement then the purchase price shall be reduced by $2 million, and Jay shall determine how this reduction in the purchase price shall be allocated.

The option agreement did not contain any provisions pertaining to Cathy's interests in the Rhea Trust or the family's businesses. Cathy was not given the option to purchase the assets of the trust.

"Rescission of a contract is an equitable remedy to be exercised in the sound discretion of the trial court." *Schmude Oil Co v Omar Operating Co*, 184 Mich App 574, 586-587; 458 NW2d 659 (1990). Here, the probate court concluded that the option agreement was part of a pattern of favoring Jay over Cathy. The probate court reasoned that the option's delay of

distribution to Cathy and the fact that the option was offered only to Jay, along with the present proxy and the $2,000,000 penalty,[6] supported this conclusion.

On appeal, Robert and Jay argue that there is a question of fact regarding whether the option favored Jay over Cathy. Robert argues that any discounts to the purchase price would only be applied by an independent appraiser after determining the fair market value, and that Cathy would not necessarily be disadvantaged by the repayment period if Jay exercised the option. However, the probate court did not solely rely on either the discounts or the repayment period in setting aside the option agreement. Rather, the probate court appropriately considered the overall delay in distribution to Cathy, which ran contrary to the terms of the Rhea Trust. Pursuant to the option agreement, Jay would be able to purchase the entire interest in Brody Realty immediately upon exercising the option, while Cathy would not be paid for her interest for 15 years.

Jay suggests that the 15-year option period was not more beneficial to Jay than to Cathy, and that distribution delays are allowed under the terms of the Rhea Trust. Jay is correct that, under the trust, the trustee may "delay making the distributions and divisions . . . for a reasonable period of time if the Trustee, in its sole discretion, determines that such delay will accomplish one or more of the trust's purposes." Even if a 15-year delay is deemed a "reasonable period of time" under the language of the trust, the delay itself affected Cathy and Jay unequally. Neither Cathy's nor Jay's interests in Brody Realty would be distributed until the option was exercised or expired. But Jay would enjoy the full control over the entity through the proxy during that period. The inequity in that arrangement is clear. Additionally, the language of the option agreement evidences a clear intent to favor Jay's interests over Cathy's, Robert's, and the Rhea Trust's. Robert and Jay have failed to establish any error requiring reversal of the portion of the order setting aside the option agreement.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Kathleen Jansen
/s/ Christopher M. Murray

---

[6]Peripherally, the parties dispute whether the proxy and the $2,000,000 penalty in the option agreement were permissible under Michigan law. We need not decide these questions because we conclude that the probate court did not err when it set aside the option agreement containing those provisions.